[Cite as *State v. Yatson*, 2022-Ohio-2621.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 20CA011658 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| RYAN YATSON | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 16CR094758 |

DECISION AND JOURNAL ENTRY

Dated: August 1, 2022

TEODOSIO, Presiding Judge.

{¶1} Defendant-Appellant, Ryan Yatson, appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} Shortly before 6:30 a.m. one Saturday morning, someone fired thirty shots into C.R.'s home using an AR-15 and armor-piercing rounds. C.R., his sister, and his father were home at the time, and one of the rounds struck C.R.'s sister in the back of her shoulder. C.R.'s father was awake when the shooting began and immediately called 911 for help. While his father was speaking with the dispatcher, C.R. began screaming that he knew Mr. Yatson was responsible for the shooting.

{¶3} C.R. and Mr. Yatson had been acquainted for over twenty years and generally had a good relationship. A week before the shooting, however, C.R. drank too much at a small party Mr. Yatson was hosting and became disruptive. A fight broke out between them, and, during the

affray, C.R. was beaten. He walked home after the incident and did not have any contact with Mr. Yatson over the next week.

{¶4} The night before the shooting, C.R. attended a concert in Cleveland with a large group of friends. During the concert, he began receiving phone calls from Mr. Yatson and another man, J.H. He initially answered the calls but stopped after a while because Mr. Yatson and J.H. were threatening him. When Mr. Yatson and J.H. continued to call, C.R. silenced his cell phone and allowed the calls to go to voicemail. The calls continued until approximately fifteen minutes before the shooting and generally consisted of disparaging remarks and taunts, daring C.R. to fight and threatening him and his family. About twenty minutes before the shooting, C.R. posted on social media that he had arrived back home safely from the concert. He was already asleep when the shooting began.

{¶5} The police responded to C.R.'s home in the wake of the shooting, ensured that C.R.'s sister was transported to the hospital, and began collecting evidence. Several officers then drove to Mr. Yatson's home, which was located a few streets away. Mr. Yatson's garage door was partially open when the police arrived, and officers heard two voices coming from inside the garage. Mr. Yatson and J.H. emerged from the garage shortly thereafter, at which point the police took them into custody. The police found a third man, W.S.-T., passed out on the floor of Mr. Yatson's garage and also took him into custody.

{¶6} A car was parked in Mr. Yatson's driveway, and officers noted that its engine was still warm. Officers also found casings from three armor-piercing rounds on the back deck of the car, and an AR-15 with armor-piercing bullets on a shelf inside Mr. Yatson's bedroom closet. Mr. Yatson, J.H., and W.S.-T. all tested positive for the presence of gunshot residue, and ballistics testing confirmed that Mr. Yatson's AR-15 had been used to shoot C.R.'s home. Based on the

angle and spacing of the shots that had been fired into C.R.'s home, the presence of casings inside the car in Mr. Yatson's driveway, and the lack of any casings on the ground or street outside C.R.'s home, the police theorized that all of the shots fired at C.R.'s home had been fired from the vehicle parked in Mr. Yatson's driveway while it was traveling on the street directly alongside C.R.'s home.

{¶7} Mr. Yatson was charged with felonious assault based on serious physical harm, felonious assault based on physical harm by means of a deadly weapon, improperly discharging a gun into a habitation, discharging a firearm on a public road, and improperly handling a firearm in a motor vehicle. Additionally, each of his counts contained two firearm specifications. The first specification linked to each count related to displaying, brandishing, indicating possession of, or using a firearm to facilitate his offenses. The second specification linked to each count related to discharging a firearm from a motor vehicle.

{¶8} At trial, the State argued that Mr. Yatson perpetrated the shooting but also that he was complicit in the commission of each offense. The jury found Mr. Yatson not guilty of felonious assault based on serious physical harm but was unable to reach a verdict on his remaining counts. Thus, the trial court declared a mistrial on those counts and set the matter for further proceedings. A second jury trial later commenced, and the State once again argued complicity as an alternative theory.

{¶9} After the evidentiary phase of the second trial concluded and deliberations began, a variety of issues arose. First, the court received several questions from the jury about complicity and its application. Second, the court met with a juror in chambers because she alerted the court's bailiff that she was struggling with the stressful nature of deliberations. Third, the jury notified the court on the second day of deliberations that they were at an impasse. The court responded to

the jury's communications by either providing them with written responses or meeting with them to issue additional instructions. Finally, on the third day of deliberations, the jury notified the court that they had reached a decision on most counts but were deadlocked on others. At that point, the court also was notified of two potential issues that caused it to question three jurors. The court questioned two jurors about a conversation they had with one another during a smoke break. The court questioned a third juror because she was seen mouthing an apology to people seated in the gallery of the courtroom during a pause in deliberations. As a result of each of the foregoing issues, Mr. Yatson repeatedly moved for a mistrial. Each time, the trial court denied his motion.

{¶10} Once the jury confirmed they were deadlocked and further deliberations would prove futile, the court accepted their partial verdict. The jury found Mr. Yatson guilty of felonious assault based on physical harm by means of a deadly weapon, improperly discharging a gun into a habitation, and discharging a firearm on a public road. Further, the jury found Mr. Yatson guilty of the first firearm specification linked to each of those counts. The jury was unable to reach a unanimous decision on the remaining count of improperly handling a firearm in a motor vehicle and the second firearm specification linked to each of his counts (i.e., for discharging a firearm from a motor vehicle). Mr. Yatson's remaining count and specifications were later nolled.

{¶11} After the trial court dismissed the jury, the court began collecting the jury's notes from the jury room. It then discovered a photocopy of a dictionary page containing a definition of the word "complicity." The court notified the attorneys of its discovery, and Mr. Yatson responded by filing a motion for a new trial or, in the alternative, a motion to declare a mistrial. The State filed a brief in opposition, and the court conducted a hearing. At the hearing, the court determined that the best course of action would be to voir dire each juror regarding the photocopy it had found.

The court and the parties then individually met with each juror, and each juror answered their questions about the photocopy and its impact on deliberations.

{¶12} Once each juror had been questioned, Mr. Yatson filed a supplement to his motion for a new trial, and the State filed a supplement to its brief in opposition. The trial court reviewed the filings and denied Mr. Yatson's motion on the record in open court. The court then sentenced Mr. Yatson to a total of fourteen years in prison.

{¶13} Mr. Yatson now appeals from his convictions and raises five assignments of error for our review. To facilitate that review, this Court rearranges several of the assignments of error.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY FAILING TO DECLARE A MISTRIAL BASED ON JUROR MISCONDUCT.

{¶14} In his first assignment of error, Mr. Yatson argues that the trial court erred when it failed to declare a mistrial based on three separate instances of juror misconduct. We do not agree.

{¶15} "A trial court enjoys broad discretion in dealing with matters of juror misconduct." *State v. Hickman*, 9th Dist. Summit No. 27321, 2015-Ohio-4668, ¶ 31. Consequently, a court's ruling on a motion for mistrial or a motion for a new trial based on juror misconduct will be reversed only for an abuse of discretion. *State v. Roper*, 9th Dist. Summit No. 29466, 2021-Ohio-188, ¶ 8; *State v. Dukes*, 9th Dist. Summit No. 27966, 2019-Ohio-2893, ¶ 19. An abuse of discretion implies the court's decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying this standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶16} "When analyzing a case of alleged juror misconduct, it must be determined (1) whether misconduct actually occurred and (2) whether the misconduct materially prejudiced the defendant's substantial rights." *State v. Morris*, 9th Dist. Summit No. 25519, 2011-Ohio-6594, ¶ 28. *Accord Roper* at ¶ 9. "Thus, even when juror misconduct has, in fact, occurred, a complaining party must establish prejudice." *Hickman* at ¶ 32. "[T]he trial judge is in the best position to ascertain the nature of the alleged jury misconduct and to fashion the appropriate remedy if the conduct did occur." *Dukes* at ¶ 19. "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *State v. Phillips*, 74 Ohio St.3d 72, 89 (1995).

{¶17} We begin by addressing a short argument Mr. Yatson has made about prejudice in the context of juror misconduct. Citing *State v. Phillips*, 74 Ohio St.3d 72 (1989), Mr. Yatson argues that prejudice is presumed once juror misconduct is discovered. Since *Phillips* was decided, however, the Ohio Supreme Court has squarely rejected the notion that a presumption of prejudice arises in every instance of juror misconduct. *See State v. Keith*, 79 Ohio St.3d 514 (1997). The *Keith* Court "reaffirmed a long-standing rule that a court will not reverse a judgment based upon juror misconduct unless prejudice to the complaining party is shown." *Keith* at 526. To the extent Mr. Yatson argues otherwise, this Court rejects his argument. As the complaining party, Mr. Yatson bore the burden of proving that any instances of juror misconduct materially prejudiced his substantial rights. *See Hickman* at ¶ 32; *Morris* at ¶ 28; *Roper* at ¶ 9.

{¶18} Mr. Yatson claims that three separate instances of juror misconduct deprived him of a fair trial. First, he argues that he was deprived of a fair trial when a juror brought an outside definition of the word "complicity" into the jury room during deliberations. Second, he argues that he was deprived of a fair trial when that same juror communicated with C.R.'s family by mouthing the words "I'm sorry." Finally, he argues that he was deprived of a fair trial when

members of the jury placed emotional pressure on another juror during deliberations, causing her to reach out to the trial court. This Court will separately address each instance of alleged misconduct.

Outside Definition of Complicity

{¶19} The trial court discovered a photocopy of a dictionary page while gathering the jury's notes from the jury room at the conclusion of the second trial. The photocopied page contained a definition of the word "complicity."[1] The discovery of that outside definition prompted a hearing with the parties and subsequent hearings wherein the court and the parties questioned each juror about the outside definition and its impact, if any, on the verdict. Nine jurors said they either did not see the outside definition or could not recall having seen it, did not recall discussing it, and only relied on the court's instructions in reaching their decision. Three jurors, one of whom had brought in the outside definition, recalled the outside definition being discussed, but clarified that it was only briefly referenced during a much larger conversation about complicity. Those same three jurors also testified that they had reached their decision based strictly on the court's instructions and definitions.

{¶20} The trial court found that juror misconduct had occurred but that it had not materially prejudiced Mr. Yatson's substantial rights. The court reached the latter conclusion based on several different factors. First, the court noted that it had conducted a thorough polling

---

[1] The complicity definition at issue reads: "the state of being an accomplice; partnership or involvement in wrongdoing."

of the jury at the conclusion of trial due to other issues that had arisen during deliberations. Each juror was asked (1) whether the verdicts reached by the group were also the individual juror's own verdicts, (2) whether the juror's verdicts had been impacted by any pressure exerted by other jurors or any outside sources, (3) whether sympathy for either side had impacted the juror's verdicts, and (4) whether the juror's verdicts were based on the evidence in the case and the law provided by the court. The court emphasized that each juror had confirmed their verdict, the fact that his or her verdict had not been impacted by pressure or sympathy, and the fact that his or her verdict had been based on the evidence and the law provided by the court.

{¶21} Second, the court noted that a majority of the jury reported being unaware of the outside definition of complicity or any discussion of it during deliberations. While three jurors remembered the outside definition being discussed, the court did not consider their testimony to be in conflict with that of the other jurors. Those three jurors sat next to one another during deliberations, and the court found it unsurprising that different groups of jurors would be discussing different issues as the larger conversation unfolded.

{¶22} Third, the court noted that any discussion of the outside definition that did occur was minimal and was followed by at least another full day of deliberations. The juror who brought in the outside definition testified that she referenced it a single time during a larger discussion of complicity. Likewise, the two jurors sitting next to her only recalled the outside definition being briefly raised in the context of a larger discussion that continued well after that point. The court found that there was no discussion of the outside definition beyond that brief reference.

{¶23} Fourth, the court compared the outside definition of complicity with the definition the court had included in its jury instructions. Though the court found its own definition more precise, it determined that the two definitions were "not that significantly different." The court

noted that the outside definition "wouldn't have necessarily sent [a] juror on a completely different path * * * [and] probably would not have calmed the curious juror, either." Thus, the court did not find that the outside definition contradicted or detracted from the complicity definition set forth in the jury instructions.

{¶24} Finally, the court noted that every single juror testified under oath that they reached their own verdicts based on the court's instructions of law and its definition of complicity rather than any outside definition. The court found each juror's testimony in that regard to be credible. That testimony, combined with the foregoing factors, led the court to conclude that the introduction of the outside definition did not materially prejudice Mr. Yatson's substantial rights.

{¶25} Mr. Yatson argues that the trial court erred when it failed to declare a mistrial. He argues that complicity was "the 'hot topic' issue" at his trial, as evidenced by the jury's questions and each juror's subsequent testimony that it was a focal point of deliberations. He notes that one juror described two or three other jurors being stuck on the issue of complicity until the outside definition helped those jurors come to a decision. Further, he notes that there was conflicting testimony as to whether the outside definition was read aloud to the entire group. If the jurors considered the outside definition, Mr. Yatson argues, that impropriety could not be cured with simple assurances from the jurors that it did not influence their decision.

{¶26} The State concedes and the record supports the conclusion that juror misconduct occurred when a juror brought an outside definition of complicity into the jury room. *See, e.g., State v. Sheppard*, 84 Ohio St.3d 230, 233 (1998); *State v. Thomas*, 9th Dist. Summit No. 26893, 2014-Ohio-2920, ¶ 37-38. Thus, the only question is whether the trial court abused its discretion when it determined that the misconduct did not materially prejudice Mr. Yatson's substantial rights. *See Roper*, 2021-Ohio-188, at ¶ 8; *Dukes*, 2019-Ohio-2893, at ¶ 19. Having reviewed the

record, we cannot conclude that the trial court acted arbitrarily, unreasonably, or unconscionably in reaching that determination. *See Blakemore*, 5 Ohio St.3d at 219.

{¶27}  The record reflects that the trial court conducted extensive inquiries to determine whether each juror had reached his or her verdicts based on the evidence and law provided by the court. Each juror repeatedly affirmed that their verdicts were based on the evidence and the court's instructions rather than any outside source or definition. Mr. Yatson cites a single portion of one juror's testimony, wherein she stated that two or three jurors were stuck on the issue of complicity and only reached a decision after the outside definition was introduced. That same juror later clarified, however:

> [JUROR]: I'm just saying it -- the conversation of complicity swayed the jurors. I wasn't sure what you guys were getting at in the beginning of this whole thing. No, I didn't mean the [outside definition] swayed anybody. I mean, the conversation of complicity did.
>
> [QUESTION]: And what it means, and what the word means itself?
>
> [JUROR]: And what the word means. But the words on that piece of paper were --
>
> [QUESTION]: Did not sway you; right?
>
> [JUROR]: Correct.

That same juror also testified that she only remembered the outside definition being mentioned once compared to the "hundreds of times" the jury reviewed the court's instructions of law.

{¶28}  It was not unreasonable for the trial court to rely on each juror's testimony that the outside definition did not impact the verdicts in this matter. *See Phillips*, 74 Ohio St.3d at 89. The record reflects that the trial court conducted a thorough inquiry regarding the misconduct that occurred and offered a detailed, well-reasoned rationale for its ruling. The trial court was in the best position to determine whether a mistrial was warranted under the circumstances, *see Dukes*, 2019-Ohio-2893, ¶ 19, and this Court will not second-guess its decision, *see Pons*, 66 Ohio St.3d

at 621. Mr. Yatson failed to establish that his substantial rights were materially prejudiced by the misconduct that occurred. *See Hickman*, 2015-Ohio-4668, at ¶ 39. Accordingly, the trial court did not abuse its discretion when it refused to declare a mistrial.

<u>Juror's Alleged Communication with C.R.'s Family</u>

**{¶29}** After deliberations commenced, the jury notified the court on several occasions that they were unable to reach an agreement. The trial court initially addressed the jurors in the jury room but later returned them to the courtroom to issue a *Howard* charge. Deliberations resumed after the initial *Howard* charge and continued until the jury notified the court that further deliberations would prove futile. The court then met with the parties to gain input as to its next steps. At that point, the defense notified the court of two unrelated issues that required attention. Relevant to the discussion herein, the defense informed the court that Juror 8 had been seen mouthing an apology "to individuals they perceived as members of the complaining witness's family." Mr. Yatson moved for a mistrial based on the improper communication.

**{¶30}** The trial court brought Juror 8 into the courtroom to discuss her alleged misconduct. Juror 8 admitted that the last time the jury had come back into the courtroom as a group, she had mouthed "I'm sorry" to people sitting in the courtroom.[2] She indicated that the reason she apologized was that she felt bad deliberations were taking so long. She specified that she felt bad for everyone, including herself, and that her only purpose in apologizing was to convey that she was sorry about the length of the deliberations. Juror 8 denied that there were any additional reasons behind her decision to apologize. Further, when the court later polled her about her

---

[2] The trial court later clarified that the side of the courtroom to which Juror 8 had directed her comment was the side of the courtroom where "people * * * generally associated with the State's witnesses" were seated.

verdicts, she affirmed that they were based on the evidence and the law and had not been impacted by any outside pressure or sympathy.

{¶31} Mr. Yatson argues that the trial court abused its discretion when it failed to declare a mistrial due to Juror 8's misconduct. According to Mr. Yatson, Juror 8 spoke with the complaining witness' family and did so in front of two other jurors during a smoke break. He argues that Juror 8's conduct was prejudicial to him "because it influenced the other two jurors to have sympathy to the complaining witness' family and therefore, against [him]."

{¶32} Although a separate instance of alleged juror misconduct took place during a smoke break between different jurors, Juror 8's alleged misconduct did not occur in the manner Mr. Yatson has described. The record reflects that Juror 8 mouthed an apology to the gallery while inside the courtroom. She did not speak with members of C.R.'s family. Additionally, there is no indication in the record that any of her fellow jurors were aware she had mouthed an apology to the gallery. Assuming without deciding that Juror 8 engaged in misconduct, Mr. Yatson has not explained how her misconduct materially prejudiced his substantial rights under the foregoing circumstances. *See* App.R. 16(A)(7). This Court will not create an argument on his behalf. *See Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). The trial court questioned Juror 8 regarding her actions, Juror 8 did not express sympathy regarding any substantive aspect of the case, and she later affirmed that her verdicts were not the result of any outside pressures or sympathy. Mr. Yatson has not shown that the trial court abused its discretion by denying his motion for a mistrial under the foregoing circumstances. Accordingly, this Court rejects his argument insofar as it pertains to Juror 8's alleged misconduct.

Pressure during Deliberations

{¶33} Finally, Mr. Yatson argues that he was deprived of a fair trial when jurors pressured one of their fellow jurors, Juror 3, to convict him. He notes that, during deliberations, Juror 3 alerted the court that she was experiencing stress and felt the other jurors were not listening to her. He also notes that a different juror later admitted apologizing to Juror 3 during a smoke break about the way other jurors had spoken to her. Mr. Yatson argues that juror misconduct occurred when jurors pressured Juror 3 because the jury clearly ignored the court's instructions to listen to their fellow jurors and be open to changing their opinions. Because the verdicts were a product of peer pressure rather than free will, Mr. Yatson argues, the trial court abused its discretion by denying his motion for a mistrial.

{¶34} The record reflects that the jury began deliberating just before lunch on a Tuesday. The jury had two questions for the court by the end of the first day of deliberations, and the court provided them with a written response before releasing them for the evening. Day two of their deliberations began the following day and, sometime that morning, Juror 3 alerted the court's bailiff that she was feeling "very stressed." The trial court then met with Juror 3 and the parties in chambers to discuss her concerns.

{¶35} Juror 3 became upset while speaking with the court and apologized for being emotional. She indicated that she was only in her mid-20s, her best friend had recently died, and she felt that she was the only one in the jury room who was "maybe looking at things differently * * *." She expressed feeling "like the kid in the room" and not liking how she felt there. Even so, Juror 3 indicated that she just needed a short break because she had gotten a bit overwhelmed in the moment. She affirmed that she was capable of serving on the jury and would just like another few minutes before resuming deliberations.

{¶36} Once Juror 3 left the trial court's chambers, the court spoke with the attorneys. Mr. Yatson initially asked the court to instruct Juror 3 about the unimportance of a juror's age. After further discussion, he also asked the court to issue a *Howard* charge. The trial court felt a *Howard* charge was premature at that juncture but offered to reinstruct the jury about considering each other's opinions and deliberating with the objective of reaching an agreement. Mr. Yatson assented to that instruction, and the court addressed the jury in the jury room. Deliberations resumed after the court's instruction but stalled later that same day. The court then issued a *Howard* charge, and deliberations continued until the afternoon of the following day (i.e., Thursday).

{¶37} Once the jury notified the court that further deliberations would prove futile, the court met with the parties to gain input as to its next steps. At that point, the defense notified the court of two unrelated issues that required attention. Relevant to the discussion herein, Mr. Yatson's attorney informed the court that he had seen the jury foreman, Juror 10, speaking with Juror 3 on a smoke break and waving his hand. Because that exchange occurred not long before the jury notified the court that they had reached a decision on most of the counts, Mr. Yatson believed Juror 10 might have spoken to Juror 3 about changing her vote. In response to that concern, the trial court separately questioned Juror 10 and Juror 3.

{¶38} Juror 10 acknowledged that he had spoken with Juror 3 during a smoke break but denied that they had talked about the merits of the case. He indicated that they had briefly spoken about the deliberative process in general. While speaking with Juror 3, Juror 10 apologized to her because she felt other jurors had not spoken to her nicely.

{¶39} Juror 3 likewise told the court that she and Juror 10 had discussed the deliberative process in general. She stated that they had briefly talked about her "internal frustration of feeling

not being heard and being berated and belittled in the jury room." Juror 3 confirmed that the conversation had not been about the case itself. She also confirmed that the discussion had not impacted her consideration of the merits of the case.

{¶40} Mr. Yatson subsequently moved for a mistrial, in part, because he continued to believe that Juror 3 had been influenced by other jurors. The trial court refused to grant a mistrial but added several questions to its inquiry when polling the jurors. As noted, each juror was asked (1) whether the verdicts reached by the group were also the individual juror's own verdicts, (2) whether the juror's verdicts had been impacted by any pressure exerted by other jurors or any outside sources, (3) whether sympathy for either side had impacted the juror's verdicts, and (4) whether the juror's verdicts were based on the evidence in the case and the law provided by the court. Each juror, including Juror 3, confirmed their verdicts, the fact that their verdicts had not been impacted by pressure or sympathy, and the fact that their verdicts had been based on the evidence and the law provided by the court.

{¶41} Having reviewed the record, this Court cannot conclude that the trial court abused its discretion when it denied Mr. Yatson's motion for a mistrial. *See Dukes*, 2019-Ohio-2893, at ¶ 19. The Ohio Supreme Court has rejected the notion that juror misconduct occurs when jurors place pressure on one another during deliberations. *State v. Hessler*, 90 Ohio St.3d 108, 120 (2000).

> "The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States*, 164 U.S. 492, 501 (1896). The requirement of a unanimous decision, however, does not come without a price. Heightened emotions and intense feelings are part and parcel of this process. Experience tells us that during deliberations, it is not unusual to find heavy-handed influencing, browbeating, and even bullying to a certain extent. For always there is the possibility that "articulate jurors may intimidate the inarticulate, the aggressive may unduly influence the docile." *People v. De Lucia*, 20 N.Y.2d 275, 278 (1967); *People v. Redd*, 164 A.D.2d 34, 37 (1990) (both cases providing policy reasons for rule prohibiting jurors to impeach their own verdicts).

*Id.* Given the foregoing, this Court is not convinced that Mr. Yatson demonstrated actual misconduct based on the jury's treatment of Juror 3.

{¶42} Even assuming Mr. Yatson successfully demonstrated misconduct on the part of the jury, the record supports the trial court's conclusion that he failed to establish material prejudice to his substantial rights. *See Hickman*, 2015-Ohio-4668, at ¶ 39. The trial court questioned Juror 3 by herself on two separate occasions. She indicated that the stress she felt was due to a variety of issues, including the recent death of her best friend, and that she was capable of remaining on the jury. She repeatedly affirmed both in chambers and during the polling of the jury that her decisions were her own and had not been impacted by any pressure or sympathy. Juror 3 "was given the chance to declare in open court her assent to or dissent from the recommendations. Thus, she was given the opportunity to change her mind if she desired." *Hessler* at 121. Juror 3 never did so. Under the foregoing circumstances, this Court cannot conclude that the trial court abused its discretion when it denied Mr. Yatson's motion for a mistrial. Thus, Mr. Yatson's first assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

> THE VERDICT IN THIS CASE IS AGAINST THE SUFFICIENCY OF THE EVIDENCE AND SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO.

{¶43} In his fourth assignment of error, Mr. Yatson argues that his convictions are based on insufficient evidence. Specifically, he argues that the State failed to prove he was complicit in the commission of any of his offenses. For the following reasons, this Court rejects his argument.

{¶44} Whether a conviction is supported by sufficient evidence is a question of law, which this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "A challenge to

the sufficiency of the evidence concerns the State's burden of production * * *" and is, "[i]n essence, * * * a test of adequacy." *In re R.H.*, 9th Dist. Summit No. 28319, 2017-Ohio-7852, ¶ 25; *Thompkins* at 386. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. However, "we do not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact." *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

{¶45} A person commits felonious assault if he "knowingly * * * [c]ause[s] or attempt[s] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). The crime of improperly discharging a firearm into a habitation occurs when a person, "without privilege to do so, [] knowingly * * * [d]ischarge[s] a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual * * *." R.C. 2923.161(A)(1). Finally, a person commits the crime of discharging a firearm on or near a prohibited premises if he "[d]ischarge[s] a firearm upon or over a public road or highway." R.C. 2923.162(A)(3).

{¶46} Complicity is governed by R.C. 2923.03. Relevant to this appeal, the statute prohibits any person "acting with the kind of culpability required for the commission of an offense" from "[a]id[ing] or abet[ting] another in committing the offense * * *." R.C. 2923.02(A)(2). "To support a conviction for complicity by aiding and abetting * * *, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "Such intent may be inferred from the

circumstances surrounding the crime," *id.* at syllabus, and "the presence, companionship, and conduct of the defendant before and after the offense is committed." *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, ¶ 13.

{¶47} C.R. testified that he and Mr. Yatson were friends before this incident occurred and had known each other for more than twenty years. The two lived in the same neighborhood, and, the week before the shooting, C.R. went to a small party at Mr. Yatson's house. C.R. became extremely intoxicated during the party and ended up engaging in a fistfight with Mr. Yatson before walking home. Although C.R. tried visiting Mr. Yatson a few times over the following week to apologize for his behavior, he was never able to speak with him.

{¶48} The weekend after the fight, C.R. went to a concert in Cleveland with a large group of friends. While at the concert, he began receiving phone calls and realized that the caller was Mr. Yatson and another individual named J.H. C.R. had known J.H. for more than ten years and acknowledged that they did not get along. He testified that Mr. Yatson and J.H. sounded intoxicated on the calls and kept taunting him and encouraging him to return to Mr. Yatson's house to fight. C.R. eventually let the calls go to voicemail, and the State played the voicemails at trial. Although the sound quality was poor, C.R. identified Mr. Yatson's and J.H.'s voices on the calls. He testified that they were talking about having sexual relations with his mother and his sister. He also heard (1) Mr. Yatson remark that J.H. was "about to walk down there and do something[,]" and (2) J.H. say he was "about to come do something with a shotgun and kablam."

{¶49} C.R. estimated that he returned home from the concert between 5:30 and 6:00 a.m. Before going to sleep, he posted on social media that he had arrived home safely. He then went to bed and was awoken about twenty minutes later by the sound of gunfire. C.R. testified that he told the police Mr. Yatson and J.H. were responsible for the shooting because of the threatening phone

calls they had made throughout the evening. C.R. also knew that Mr. Yatson owned an AR-15. He testified that Mr. Yatson had allowed him to fire the gun sometime during the week preceding their fight. C.R. fired the gun into the ground in Mr. Yatson's backyard.

{¶50} Officer Brook Stewart responded to C.R.'s home after the shooting and remained there for about an hour and a half before he and other officers went to Mr. Yatson's home. Officers slowly approached Mr. Yatson's home on foot from different directions due to their concern that he had a firearm. As they came closer, Officer Stewart testified, they could hear music and voices coming from Mr. Yatson's garage. The garage door was partially opened, and the officers waited outside to further assess the situation. As the officers continued to wait, Mr. Yatson and J.H. emerged from the garage, and officers took them into custody. The officers also found a third man, W.S.-T., either sleeping or passed out on the floor of the garage and secured him.

{¶51} Mr. Yatson, J.H., and W.S.-T. had already been taken into custody by the time Captain Kevin Jones arrived at Mr. Yatson's home. Captain Jones testified that there was a four-door vehicle parked in the middle of Mr. Yatson's driveway. The car had recently been driven because Captain Jones could feel that the engine compartment was warm. Additionally, when he looked through the rear window, he spotted three spent casings on the back deck of the car on the rear passenger's side. The casings were consistent with AR-15 style rounds and collected for testing.

{¶52} Captain Jones returned to Mr. Yatson's house later that same day to help execute a search warrant. Inside Mr. Yatson's bedroom closet, he found an AR-15 and a rifle bag lying on top of a storage cabinet. There was an armor piercing round chambered inside the AR-15, and the weapon's selector switch was in the "fire" position rather than the "[s]afe" position. The police also found boxes of ammunition and two magazines with the AR-15, one of which was loaded

with armor piercing rounds and one of which was loaded with traditional AR-style rounds. Additionally, the police found six spent casings inside a garbage can in Mr. Yatson's bedroom and six spent casings in a loft area inside Mr. Yatson's garage. Captain Jones confirmed that Mr. Yatson, J.H., and W.S.-T. were each swabbed for the presence of gunshot residue and all three men tested positive.

{¶53} Officer Ian Wilshire acted as the evidence technician at C.R.'s house and employed a laser measurement system to study the shots fired at the house. He identified thirty separate gunshot holes in the house and indicated that the shots had not been fired from a single location. Rather, each shot had been fired from a different point, meaning that the shooter was moving while firing. He testified that he was at the house for four or five hours performing his analysis and examining the area, but never found a single spent casing between the yard and the street.

{¶54} Lieutenant Greg Petek also responded to Mr. Yatson's house after the shooting. He was on scene when Mr. Yatson, J.H., and W.S.-T. were taken into custody and confirmed that all three men were intoxicated. He testified that the men were patted down for weapons, and, inside J.H.'s pocket, the police found the keys to the car parked in Mr. Yatson's driveway. When Lieutenant Petek asked Mr. Yatson and J.H. where the gun was, both men denied having a gun. The lieutenant testified that Mr. Yatson specifically said "he didn't have a gun, he didn't know where a gun would be[, and] * * * he didn't know if anybody was in [his] house."

{¶55} Lieutenant Petek testified that the police examined C.R.'s call history because he told them he had received threatening calls before the shooting. The call history showed that C.R. initially began receiving phone calls from Mr. Yatson's number and, once he began ignoring them, he began receiving calls from a second number belonging to J.H. and then a third number belonging to W.S.-T. W.S.-T.'s phone number was used to call C.R. five times between 5:52 a.m.

and 6:05 a.m., approximately fifteen minutes before the shooting. Lieutenant Petek confirmed that both Mr. Yatson's and J.H.'s voices could be heard on the voicemails stemming from those calls.

{¶56} The following day, Lieutenant Petek met Mr. Yatson at the jail for an interview. Although Mr. Yatson admitted that he owned the AR-15 the police found in his bedroom closet, he claimed that he could not remember anything around the time of the shooting. He told the lieutenant that he had a problem with alcohol and had blacked out from drinking. He did not remember calling C.R. or having anything to do with the shooting. He told the lieutenant that he remembered shooting his AR-15 in his backyard with J.H. and W.S.-T. the previous evening before they started drinking. After that, he recalled playing beer pong at some later point and crawling out from under his garage door before the police arrested him.

{¶57} One of Mr. Yatson's neighbors also testified for the State. The neighbor testified that she lived three houses down from Mr. Yatson and was hosting a sleepover for her son and his friends the evening before the shooting. Because the kids were sleeping in the backyard, the neighbor kept her windows open all night. She testified that she would have heard any loud noises that evening because she was listening for issues with the children. Yet, the only gunfire she heard in the neighborhood came sometime around 6:00 a.m. The neighbor confirmed that she had heard gunfire in the neighborhood before, so she recognized the sound. She confirmed that she never heard any gunfire the previous evening.

{¶58} The neighbor testified that, after she heard the gunfire, she got out of bed and went outside to check on the children. She then came back into the house and made coffee. It is not clear from the record exactly how long the neighbor remained inside, but she testified that she next opened her garage door, went outside, and tried calling her husband. As she was standing in her driveway, she saw an unfamiliar car come toward her and pull into Mr. Yatson's driveway. The

neighbor knew Mr. Yatson and did not see him inside the car.  She only saw "a tall blond kid" who was not Mr. Yatson.  Phone records showed calls between the neighbor and her husband at 7:09 a.m. and 8:02 a.m.

{¶59}  The State introduced forensic evidence related to firearms analysis and DNA analysis.  A firearms analyst tested Mr. Yatson's AR-15 and confirmed that the gun was operable.  He also compared cartridge cases he test-fired from the AR-15 with cartridge cases retrieved from C.R.'s home and testified that they bore matching marks.  He confirmed that the marks were particular to Mr. Yatson's AR-15, meaning that his AR-15 had been used in the shooting at C.R.'s house.  Mr. Yatson's DNA profile was the only major profile found on a swab of the AR-15's magazine, and no additional profiles of sufficient quality were detected on any other swabs taken from the gun.  Of the swabs taken from a variety of spots throughout the car found in Mr. Yatson's driveway, J.H.'s DNA profile was the only major profile detected.  His DNA profile was detected on the steering wheel of the car.

{¶60}  Lieutenant Petek testified that Mr. Yatson's AR-15 would produce a very loud sound when it was discharged.  Indeed, he confirmed that the police received numerous calls when the shooting at C.R.'s home occurred.  Lieutenant Petek testified that the police were never able to locate any individuals in Mr. Yatson's neighborhood who heard gunfire at any point during the previous evening when Mr. Yatson claimed he, J.H., and W.S.-T. had fired his AR-15 in his backyard.

{¶61}  Mr. Yatson argues that the State failed to prove he aided, abetted, or solicited J.H. to commit the crimes with which he was charged.[3]  According to Mr. Yatson, Captain Jones

---

[3] In his brief, Mr. Yatson repeatedly argues that the State failed to set forth sufficient evidence of conspiracy.  Because the State only argued complicity as an alternative theory, this Court assumes that any reference to "conspiracy" on the part of Mr. Yatson amounts to a scrivener's error.

specifically acknowledged that there was no evidence to establish his guilt.  Further, Mr. Yatson argues, his neighbor testified that she did not see him in J.H.'s car when it pulled into his driveway shortly after the shooting.  Mr. Yatson notes that there was no testimony about any agreement between him, J.H., and W.S.-T. to commit the shooting or evidence that he was even aware the shooting had occurred.  Thus, he argues that his convictions are based on insufficient evidence.

{¶62}  Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved, beyond a reasonable doubt, that Mr. Yatson either fired his AR-15 into C.R.'s house or was complicit in the commission of that shooting.  *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus.  The jury heard testimony that Mr. Yatson fought with C.R. the week before the shooting, that he and J.H. left threatening messages on C.R.'s phone up until about fifteen minutes before the shooting, that his AR-15 was the gun used during the shooting, that his DNA profile was the only major DNA profile detected anywhere on the gun, that police found the gun back in his bedroom closet after the shooting,

that he initially lied about having a gun, and that swabs of his hands tested positive for the presence of gunshot residue. While the evidence against Mr. Yatson was circumstantial in nature, it is well established that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Id.* at paragraph one of the syllabus. Based on the circumstantial evidence produced at trial, the jury reasonably could have concluded that Mr. Yatson perpetrated the shooting or, in the alternative, that he aided and abetted J.H. in the commission of the shooting while sharing his criminal intent. *See Johnson*, 93 Ohio St.3d 240, at syllabus. *See also In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, at ¶ 13 (intent for complicity may be inferred from "the presence, companionship, and conduct of the defendant before and after the offense is committed").

{¶63} To the extent Mr. Yatson claims that Captain Jones conceded there was no evidence in support of the State's case, the record reflects that Mr. Yatson has taken the captain's testimony out of context. Captain Jones testified as follows:

> [DEFENSE COUNSEL]: As we sit here right now, do you have any evidence that somehow [Mr. Yatson] helped further shoot up a house?
>
> [CAPTAIN JONES]: I don't understand the question, sir.
>
> [DEFENSE COUNSEL]: All right. Do you have any evidence that [Mr. Yatson] said to [J.H.], hey, go get [C.R.]?
>
> [CAPTAIN JONES]: I do not.
>
> [DEFENSE COUNSEL]: Or that [Mr. Yatson] said to [J.H.] or [W.S.-T.], hey, go shoot this house up?
>
> [CAPTAIN JONES]: I do not.
>
> [DEFENSE COUNSEL]: Do you have any evidence that [Mr. Yatson] somehow helped them further this act?
>
> [CAPTAIN JONES]: I – *other than what's being presented here*.

[DEFENSE COUNSEL]: So, * * * if someone was to come in here and say that somehow [Mr. Yatson] coerced, or forced somebody, or engaged them to do this act, we don't have any evidence of that, do we?

[CAPTAIN JONES]: No.

(Emphasis added.) Captain Jones only testified that he was not aware of evidence against Mr. Yatson beyond the evidence the State was already presenting. Further, the State was not required to prove that Mr. Yatson "coerced," "forced," or "engaged" J.H. or W.S.-T. to perform the shooting. To sustain Mr. Yatson's convictions, the State had to prove that he perpetrated the shooting or that he "supported, assisted, encouraged, cooperated with, advised, or incited" another to do so while sharing their criminal intent. *Johnson* at syllabus. Captain Jones never conceded that the State lacked evidence to convict Mr. Yatson under the foregoing theories. Thus, this Court rejects Mr. Yatson's argument to the contrary.

{¶64} This Court likewise rejects Mr. Yatson's argument that there was no evidence he was ever in the car during the shooting. As previously noted, a sufficiency review requires a reviewing court to view all of the evidence in a light most favorable to the State. *See Jenks*, 61 Ohio St.3d 259, at paragraph two of the syllabus. J.H.'s DNA profile was detected on the steering wheel of the car, and Mr. Yatson's DNA profile was the only major DNA profile detected on the AR-15. The police found spent casings on the back deck of the car on the rear passenger's side, suggesting that one person was driving the car while a second person was shooting from the passenger's or rear passenger's side. Mr. Yatson's hands also tested positive for gunshot residue. While Mr. Yatson's neighbor only saw one person inside the car before it pulled into Mr. Yatson's driveway, the neighbor was viewing the car from three houses down and did not know what time it was when she saw the car. She only knew it was around the time she called her husband, and phone records showed calls at 7:09 a.m. and 8:02 a.m. The shooting occurred at approximately

6:19 a.m., so there was a significant time delay between the shooting and her first call. The jury reasonably could have concluded that the neighbor either just did not see any rear seat passenger(s) from her perspective at that distance or that the driver dropped off any passenger(s) at an earlier time before returning to Mr. Yatson's house. Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that the State set forth sufficient evidence that Mr. Yatson was inside the car during the shooting.

{¶65} Upon review, Mr. Yatson has not shown that his convictions are based on insufficient evidence. Accordingly, his fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND OF THE OHIO CONSTITUTION.

{¶66} In his fifth assignment of error, Mr. Yatson argues that his convictions are against the manifest weight of the evidence. For the following reasons, this Court rejects his argument.

{¶67} A challenge to the manifest weight of the evidence concerns the State's burden of persuasion. *State v. Klafczynski*, 9th Dist. Medina No. 18CA0084-M, 2020-Ohio-3221, ¶ 7. This Court has stated:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*,

9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶68} Mr. Yatson argues that his convictions are against the manifest weight of the evidence because there was "no evidence" placing him at the shooting and "no evidence" placing him in the car. He once again argues that his neighbor never saw him inside the car used during the shooting and that Captain Jones conceded evidence of his guilt was lacking. Further, he notes that even the trial court admitted there was " little direct evidence with regard to this matter.'"

{¶69} An argument that there is "no evidence" in support of a conviction "sounds in sufficiency rather than weight." *State v. Betts*, 9th Dist. Summit Nos. 29575, 29576, 29577, 2020-Ohio-4800, ¶ 34. While Mr. Yatson has included the manifest weight standard in his brief, his argument is a reiteration of the one he set forth when contesting the sufficiency of the evidence. He has not challenged the persuasiveness of the State's evidence (i.e., its reliability or believability). *See State v. Peck*, 9th Dist. Wayne No. 19AP0031, 2021-Ohio-1685, ¶ 17 (manifest weight challenges test the reliability or believability of the State's evidence). Nor has he suggested that any of the State's witnesses lacked credibility. *See State v. McCain*, 9th Dist. Medina No. 18CA0108-M, 2019-Ohio-4392, ¶ 12. Instead, Mr. Yatson has presented this Court with a limited argument that once again targets the adequacy of the State's evidence. *See State v. Webb*, 9th Dist. Summit No. 28437, 2018-Ohio-4199, ¶ 6 (noting that sufficiency tests the adequacy of evidence).

{¶70} This Court has already determined that the State set forth sufficient evidence in support of Mr. Yatson's convictions. *See* Discussion of Assignment of Error Number Four, *supra*. We are loath to formulate and address a manifest weight argument on Mr. Yatson's behalf when

he has not done so. *State v. Baker*, 9th Dist. Summit No. 29167, 2020-Ohio-19, ¶ 18; *State v. Jackson*, 9th Dist. Summit No. 28691, 2018-Ohio-1285, ¶ 47. Because Mr. Yatson has not presented this Court with a manifest weight argument in support of his claim, we decline to conduct a merits review. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8. His fifth assignment of error is overruled on that basis.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED WHEN IT INSTRUCTED THE JURY ON COMPLICITY.

{¶71} In his third assignment of error, Mr. Yatson argues that the trial court erred when it instructed the jury on complicity. Specifically, he argues that the State failed to present sufficient evidence to warrant the instruction. We disagree.

{¶72} "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. "This Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68. An abuse of discretion implies the court's decision is arbitrary, unreasonable, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶73} This Court has recognized that "'[a] complicity instruction is proper if 'the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor[.]'"" *State v. Lanik*, 9th Dist. Summit Nos. 26192, 26224, 2013-Ohio-361, ¶ 47, quoting *State v. Kirk*, 9th Dist. Summit No. 26358, 2012-Ohio-5655, ¶ 4, quoting *State v. Perryman*, 49 Ohio St.2d 14 (1976), paragraph five of the syllabus, *vacated in part on other grounds*, *sub nom. Perryman v. Ohio*, 438 U.S. 911 (1978). As set forth in our discussion of Mr. Yatson's challenge

to the sufficiency of the evidence, the State presented evidence that he fought with C.R. the week before the shooting, that he and J.H. left threatening messages on C.R.'s phone up until about fifteen minutes before the shooting, that his AR-15 was the gun used during the shooting, that his DNA profile was the only major DNA profile detected anywhere on the gun, that police found the gun back in his bedroom closet after the shooting, that he initially lied about having a gun, and that swabs of his hands tested positive for the presence of gunshot residue. "Based upon the foregoing, the trial court did not abuse its discretion in determining that the evidence adduced at trial could reasonably support [Mr. Yatson's] convictions as [an] aider[] and abettor[]." *Lanik* at ¶ 45. Mr. Yatson's argument that the trial court erred by instructing the jury on complicity lacks merit. Accordingly, his third assignment of error is overruled.

## ASSIGNMENT OF ERROR II

> THE TRIAL COURT'S ERRORS, WHEN TAKEN TOGETHER AND CONSIDERING THE CUMULATIVE ERROR DOCTRINE, DEPRIVED APPELLANT OF A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION SIXTEEN OF THE OHIO CONSTIUTTION (sic) DUE PROCESS CLAUSES.

{¶74} In his second assignment of error, Mr. Yatson argues that cumulative errors deprived him of a fair trial. We do not agree.

{¶75} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 223. To succeed on a claim of cumulative error, a defendant must establish that there were multiple instances of trial court error, *State v. Stahl-Francisco*, 9th Dist. Medina No. 19CA0093-M, 2020-Ohio-5456, ¶ 17, and that he sustained prejudice as a result of those errors, *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, ¶ 156.

If a defendant "'fail[s] to demonstrate any prejudice resulting from the errors he has alleged, he cannot demonstrate cumulative error.'" *State v. Straughan*, 9th Dist. Summit No. 29549, 2021-Ohio-1054, ¶ 68, quoting *In re F.B.*, 9th Dist. Summit Nos. 28960, 28985, 2019-Ohio-1738, ¶ 47. The Supreme Court has recognized that "'there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'" *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *United States v. Hasting*, 461 U.S. 499, 508-509 (1983).

{¶76} Mr. Yatson argues that multiple errors occurred during his second trial. The errors he has identified are as follows: (1) an outside definition of complicity being shared in the jury room; (2) a juror Googling the definition of complicity; (3) Juror 8 mouthing "I'm sorry" to individuals seated in the courtroom; (4) members of the jury placing significant pressure on Juror 3; (5) Juror 8 complaining, wanting the trial to end so that she could go on vacation, and pressuring others jurors to reach a decision; (6) the trial court's error in instructing the jury on complicity; and (7) the trial court's failure to ask the jurors whether they were comfortable participating in the trial once a State of Emergency had been declared due to Covid-19. According to Mr. Yatson, the combined effect of these errors resulted in an unfair trial.

{¶77} As noted, to succeed on a claim of cumulative error, a defendant first must establish that multiple instances of trial court error occurred during his trial. *See Stahl-Francisco*, 2020-Ohio-5456, at ¶ 17. We have already determined that Mr. Yatson did not establish trial court error as a result of pressure allegedly placed on Juror 3 by other members of the jury or the trial court's instructing the jury on complicity. *See* Discussion of Assignments of Error Numbers One and Three, *supra*. Because he has not established that error occurred in those instances, they cannot support his claim of cumulative error. *See State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 148; *Stahl-Francisco* at ¶ 17.

{¶78} Likewise, this Court cannot conclude that trial court error occurred when a juror allegedly Googled a definition of complicity, when Juror 8 allegedly became frustrated with the length of her jury service, or when the trial court did not ask the jury questions related to its Covid-19 safety protocols. Mr. Yatson has not shown that he brought any of these alleged errors to the attention of the trial court so as to create an adequate record for this Court's review. Further, he has not separately assigned any of the foregoing issues as error on appeal or cited any case law in support of his argument that the issues resulted in trial court error. His brief only contains a limited description of each of the foregoing issues.

{¶79} "It is the duty of the appellant, not this [C]ourt, to demonstrate his assigned error through an argument that is supported by citations to legal authority and facts in the record." *State v. Taylor*, 9th Dist. Medina No. 2783-M, 1999 WL 61619, *3 (Feb. 9, 1999). This Court will not create an argument on Mr. Yatson's behalf. *See* App.R. 16(A)(7); *Cardone*, 1998 WL 224934, at *8. Because he has not established that the foregoing issues resulted in trial court error, this Court cannot conclude that they support his claim of cumulative error. *See Stahl-Francisco* at ¶ 17.

{¶80} The only remaining instances of trial court error that Mr. Yatson has alleged in support of his argument are the errors related to an outside definition of complicity being brought into the jury room and Juror 8 mouthing "I'm sorry" to individuals seated in the courtroom. This Court previously examined each alleged error and concluded that neither materially prejudiced Mr. Yatson's substantial rights. *See* Discussion of Assignment of Error Number One, *supra*. Mr. Yatson's cumulative error claim cannot succeed in the absence of "multiple instances of harmless error." *State v. Haywood*, 9th Dist. Summit No. 28040, 2017-Ohio-8299, ¶ 68. To the extent he has identified two instances of trial court error, this Court is "unconvinced that the cumulative effect of these errors deprived [him] of a fair trial." *State v. McKelton*, 148 Ohio St.3d 261, 2016-

Ohio-5735, ¶ 322. *See also Straughan*, 2021-Ohio-1054, at ¶ 68, quoting *In re F.B.*, 2019-Ohio-1738, at ¶ 47 (cumulative error claim requires defendant to demonstrate prejudice resulting from alleged errors). Accordingly, his second assignment of error is overruled.

III.

**{¶81}** Mr. Yatson's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, J.
CALLAHAN, J.
CONCUR.


<u>APPEARANCES</u>:

GIOVANNA V. BREMKE, Attorney at Law, for Appellant.

J.D. TOMLINSON, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.