[Cite as *State v. Easter*, 2025-Ohio-2213.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

LUTHER EASTER

    Appellant

C.A. No.    31119

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR-2023-04-1128-B

DECISION AND JOURNAL ENTRY

Dated: June 25, 2025

CARR, Judge.

**{¶1}** Defendant-Appellant, Luther Easter, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** After learning that D.H. physically harmed his four-year-old son, Easter convinced a female friend ("the female accomplice") to flirt with D.H. on social media and encourage him to meet her in person. She initiated contact with D.H., arranged a date with him, and borrowed a vehicle to pick him up. Throughout their evening together, she used her cell phone to inform Easter of their progress and location. She and Easter agreed that she would distract D.H. long enough for Easter to arrive and beat him up.

**{¶3}** Around 11:40 p.m., the female accomplice and D.H. pulled into a parking lot at Elizabeth Park. D.H. was driving the vehicle because the female accomplice had been drinking. She agreed to have sex with D.H. to keep him there while waiting to hear from Easter. When they

finished, she exited the vehicle and tried calling Easter several times. Meanwhile, D.H. opened the driver's side door and swung his legs out of the vehicle while remaining seated. The female accomplice was still standing outside when two masked individuals ran at the vehicle and began shooting at D.H. He immediately fell to the ground and died from multiple gunshot wounds. Afterwards, the two masked individuals ran away, and the female accomplice used the vehicle to flee.

{¶4} The female accomplice called Easter several times over the next few minutes, but Easter never answered. She was unable to reach him until the following afternoon, by which point she had gotten a new cell phone. The two spoke, and the female accomplice asked Easter how she could remove blood from the vehicle she had used to meet D.H. Easter directed her to his mother's house where the two cleaned the car together. As they cleaned the car, Easter admitted responsibility for the shooting.

{¶5} The police identified the female accomplice as a person of interest more than two months after the shooting. They eventually obtained her DNA and matched it to a swab taken from D.H.'s genitals. When the police arrested the female accomplice, she admitted that Easter had asked her to set up D.H. She also identified Easter as one of the men who shot D.H.

{¶6} Easter was indicted on charges of (1) aggravated murder; (2) aggravated felony murder with kidnapping as the predicate offense; (3) aggravated felony murder with aggravated robbery as the predicate offense; (4) felony murder with kidnapping as the predicate offense; (5) kidnapping; (6) aggravated robbery; (7) tampering with evidence; and (8) having weapons while under disability. His first six counts all carried a firearm specification.

{¶7} After the evidence was presented at trial, the trial court granted Easter's motion for acquittal on his third and sixth counts. His remaining counts were submitted to the jury. The jury

found him not guilty of aggravated murder, having weapons while under disability, and each of his firearm specifications. The jury found him guilty of aggravated felony murder (with kidnapping as the predicate offense), felony murder, kidnapping, and tampering with evidence. The trial court merged his counts of felony murder and kidnapping with his count of aggravated felony murder. It sentenced Easter to a total of 28 years to life in prison.

{¶8} Easter now appeals from the trial court's judgment and raises two assignments of error for review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED WHEN IT FAILED TO INQUIRE OF THE ENTIRE JURY TO DETERMINE IF OUTSIDE INFLUENCES IMPACTED THE JURORS OR THEIR DECISION, DEPRIVING APPELLANT OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

{¶9} In his first assignment of error, Easter argues the trial court erred when it failed to voir dire the entire jury about a situation involving one juror. He argues that the court's failure to inquire deprived him of a fair trial because the situation may have influenced the other jurors. Upon review, we reject his argument.

{¶10} "When a trial court learns of an improper outside communication with a juror, it must hold a hearing to determine whether the communication biased the juror." *State v. Phillips*, 74 Ohio St.3d 72, 88 (1995). "In cases involving outside influences on jurors, trial courts are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror." *Id.* at 89. "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court." *Id.*

{¶11}   On the fifth day of trial, Juror 5 alerted the trial court's bailiff that someone from the gallery had sent him a friend request on social media.  The court and the parties spoke with the juror in chambers.  He indicated that he had received a friend request from a female he did not know but whose profile picture he recognized.  He assumed the female was associated with the defense because he had seen her sitting in the front row behind the defense table.  He was able to describe her and give the court the name she had used on social media.  Juror 5 said that he immediately blocked the friend request.  He stated that the request made him "a little nervous," but not overly so because his profile was set to private.  He indicated that the attempted contact would not impact his deliberations.  He also agreed that he did not know for sure whether the female was associated with the defense.  Although Easter asked the court to remove Juror 5, the court declined his request.  The court explained that they did not yet know who the female was. The court indicated that it would revisit the issue once it learned more about her identity.

{¶12}   The following day, the court and the parties had another conversation with Juror 5. The juror gave a more detailed description of the female's clothing and hairstyle.  The court also asked Juror 5 for the first time whether he had discussed the matter of the friend request with any of the other jurors.  Juror 5 agreed that he had "[c]asually mentioned" it to another juror and that a few other jurors may have overheard their conversation.  The court and the parties ultimately spoke with Juror 2 and Juror 8 about the exchange.  Juror 2 agreed that Juror 5 had spoken directly to him about the friend request.  Juror 2 thought it "was a little weird" but was untroubled by it. He denied that the incident would affect his deliberations.  He specifically stated that he did not see how the incident had "any bearing on the case."

{¶13}   Juror 8 agreed that she overheard Juror 5 telling Juror 2 that he had blocked someone who had tried to send him a friend request.  She indicated that she was only half listening

to their conversation, so she did not know whether the friend request came from someone associated with the defense or the prosecution. Juror 8 thought it was "crazy" that someone could have tracked down Juror 5 on social media, but she did not indicate that she had any ongoing concerns. She told the court that no further conversations about the incident had taken place.

{¶14} After speaking with the jurors, the court and the parties spoke with the female who Juror 5 believed had sent him a friend request. The female indicated that she was Easter's sister-in-law. She denied having a social media account under the name given by Juror 5. She also denied having any knowledge of a juror being contacted through social media. It appeared to the court and both parties that the female was being forthcoming.

{¶15} The court next asked the parties whether they had additional thoughts on the matter. During that conversation, the following exchange occurred:

> [DEFENSE COUNSEL:] We don't know who could be responsible for this, so in an abundance of caution, I think what we said we would do, you know, some type of curative instruction is all that you can do. We don't have enough to say one way or another here about anything. The jury didn't seem to be polluted with this.
>
> THE COURT: I'm sorry, curative instruction more than what we've already done?
>
> [DEFENSE COUNSEL]: No, no, no.
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: No, I don't think anything other than what we've done needs to be done, so I'm satisfied.
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: I still want [Juror 5] off the jury, but I'm satisfied.
>
> THE COURT: Okay.

The court refused to remove Juror 5, noting that there was no indication the incident had influenced him.

{¶16} On appeal, Easter does not argue that the trial court erred by refusing to remove Juror 5. Instead, he argues that the court erred by not questioning the entire panel about the incident. According to Easter, there is a substantial probability that the incident may have influenced the verdict.

{¶17} Easter never asked the trial court to voir dire the entire panel about this incident. Indeed, defense counsel specifically told the court that he was satisfied with its response to the situation and that "[t]he jury didn't seem to be polluted with this." Assuming without deciding those statements did not affirmatively waive this issue for appeal, Easter's failure to request a more extensive voir dire or a mistrial resulted in a forfeiture. *See State v. Sharier*, 2015-Ohio-2629, ¶ 8 (9th Dist.). Easter has not set forth a claim of plain error, and this Court will not construct one on his behalf. *See State v. Tighe*, 2016-Ohio-7031, ¶ 14 (9th Dist.). Accordingly, his first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

APPELLANT'S CONVICTIONS FOR AGGRAVATED MURDER, IN VIOLATION OF SECTION 2903.01(B) OF THE OHIO REVISED CODE, AND MURDER, IN VIOLATION OF SECTION 2903.02(B), KIDNAPPING, IN VIOLATION OF SECTION 2903.01(A)(3), TAMPERING WITH EVIDENCE, IN VIOLATION OF SECTION 2921.12(A)(1)/(2), AND HAVING WEAPONS WHILE UNDER DISABILITY, IN VIOLATION OF SECTION 2923.13(A)(3) OF THE OHIO REVI[S]ED CODE ARE UNCONSTITUTIONAL AS IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS BASED ON INSUFFICIENT EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

{¶18} In his second assignment of error, Easter argues his convictions are based on insufficient evidence and are against the manifest weight of the evidence. For the following reasons, we reject his argument.

{¶19} Initially, we note that "[a] review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations." *State v. Vicente-Colon*, 2010-Ohio-6242, ¶ 18 (9th Dist.). For this reason, "it is not appropriate to combine a sufficiency argument and a manifest weight argument within a single assignment of error." *State v. Mukha*, 2018-Ohio-4918, ¶ 11 (9th Dist.). The Ohio Rules of Appellate Procedure allow an appellate court to disregard an assignment of error if a party "fails to argue the assignment separately in [his] brief . . . ." App.R. 12(A)(2). "Nonetheless, we exercise our discretion to consider the merits of [Easter's] combined assignment of error." *State v. Walter*, 2022-Ohio-1982, ¶ 17 (9th Dist.). *Accord State v. Seibert*, 2021-Ohio-3069, ¶ 13 (9th Dist.).

### Sufficiency of the Evidence

{¶20} When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶21} Relevant to this appeal, a person commits aggravated felony murder if he purposely causes another's death "while committing or attempting to commit . . . kidnapping . . . ." R.C. 2903.01(B). A person commits felony murder if he causes another's death "as a proximate result of [his] committing or attempting to commit an offense of violence that is a felony of the first or second degree . . . ." R.C. 2903.02(B). Kidnapping is a first-degree felony offense of violence.

R.C. 2901.01(A)(9)(a) and 2905.01(C)(1). A person commits kidnapping if he, "by force, threat, or deception, . . . remove[s] another from the place where the other person is found or restrain[s] the liberty of the other person . . . to inflict serious physical harm on the victim or another . . . ." R.C. 2905.01(A)(3).

{¶22} Complicity is governed by R.C. 2923.03. Relevant to this appeal, the statute prohibits any person "acting with the kind of culpability required for the commission of an offense" from "[s]olicit[ing] or procur[ing] another to commit the offense . . . ." R.C. 2923.03(A)(1). "[O]ne who solicits or procures a [crime] is the instigator or the impetus behind the crime. He or she is the one who sets the crime in motion." (Internal citation omitted.) *State v. Rohr-George*, 2007-Ohio-1264, ¶ 14 (9th Dist.).

{¶23} The female accomplice testified that she had been close friends with Easter for several years. She was familiar with his social media accounts and gave him access to her location via the location sharing feature on her cell phone. She confirmed that, at the end of August 2022, Easter created a social media post about his young son. The post divulged that his son had been beaten. In the post, Easter threatened everyone associated with the man responsible for the beating to "move lightly . . . ." Easter wrote, "if I find out y'all rockin wit em y'all gone rock out wit em ain't nobody safe . . . ."

{¶24} The female accomplice testified that, less than three weeks after his social media post, Easter asked her to meet with him. Easter identified D.H. as the man who had beaten his son. He showed her D.H.'s Facebook profile and asked for her help setting him up. The female accomplice explained that Easter wanted her to contact D.H. for the purpose of getting D.H. "close to [her] so [Easter] could beat him up." At Easter's request, she sent D.H. a direct message on social media, expressing an interest in him.

{¶25} The female accomplice testified that D.H. responded to her message the following day. He asked to meet her. The two made plans, and the female accomplice told Easter about the plans. She also kept in contact with him during her evening with D.H. She testified that she borrowed a car from a male acquaintance and picked up D.H. The two went to Canton where they had drinks at someone's house. Afterwards, D.H. used the car to drive them back to the Akron area. D.H. stopped at a gas station and drove around a bit before eventually stopping in a parking lot at Elizabeth Park. The female accomplice testified that she used her phone to communicate with Easter during the ride to and from Canton, at the gas station, and when they stopped at Elizabeth Park. She also confirmed that Easter could use the location sharing feature on their phones to find her.

{¶26} The female accomplice testified that D.H. expressed an interest in having sex with her when they arrived at Elizabeth Park, so she agreed. She explained that she agreed because she "knew [she] needed to keep him where he was at until [Easter] knew where [she] was at." The two had sex in the driver's seat and, when they finished, the female accomplice exited the passenger's side of the car. She testified that she called Easter several times while standing in that spot, but he never answered. Meanwhile, D.H. opened the driver's side door and swung out his legs so he could get dressed.

{¶27} The female accomplice testified that she was standing outside when two people dressed in ski masks and black clothing ran at the car from behind and began shooting at D.H. He fell to the ground and, immediately after the shooting, the two shooters ran away. The female accomplice believed that she recognized one of the shooters as Easter.

{¶28} The female accomplice testified that she left D.H.'s body on the ground and fled the scene in the vehicle. Although she tried calling Easter multiple times, he never answered. She

did not speak with him until the following afternoon, by which time she had gotten a new cell phone. The female acquaintance talked to Easter about how to get the blood out of the car, and he told her to bring it to his mother's house in Akron. She testified that she drove the car there, and Easter helped her clean it. During that time, Easter admitted he had been involved in the shooting and said D.H. "got what was coming to him."

{¶29} A crime and intelligence analyst for the Akron Police Department analyzed and mapped information extracted from cell phone data records belonging to the female accomplice and Easter. The records corroborated the female accomplice's testimony that she met with Easter a few days before the shooting, traveled to Canton with D.H., stopped at a gas station with him on the return trip, and stopped in a parking lot with him at Elizabeth Park. The records showed calls between the female accomplice and Easter in the hours leading up to the shooting. They also showed that the female accomplice called Easter multiple times in the minutes leading up to the shooting and after the shooting. The analyst testified that location data showed Easter's phone in an area north of the shooting location at 11:48 p.m. The data also showed his phone in an area south of the shooting location at 12:11 a.m. The analyst testified that no location data existed between those two points in time, during which the shooting occurred. The location data did show, however, that Easter's phone and the female accomplice's new phone were in the area of Easter's mother's house the following afternoon. That location data corroborated the female accomplice's testimony that she and Easter cleaned blood from the car at that time.

{¶30} Detective James Pasheilich acted as the lead investigator in this matter. He testified that the parking lot where the shooting occurred was located next to a construction company. The company had several surveillance cameras, and the police were able to piece together segments relevant to the shooting. The footage showed a vehicle entering the Elizabeth Park parking lot and

remaining there for almost 27 minutes before a second vehicle appeared. The second vehicle proceeded to a second parking lot to the east. Approximately four minutes after the second vehicle parked, the cameras captured a series of muzzle flashes at the location of the first vehicle. They captured the second vehicle leaving about 35 seconds after the shooting and the first vehicle leaving about 79 seconds after the shooting. The detective confirmed that two different types of guns were used to commit the shooting, leading the police to believe two shooters were involved.

{¶31} Detective Pasheilich testified that the police eventually identified the female accomplice as a person of interest and spoke with her about two and a half months after the shooting. At that time, she denied any involvement and refused to give a DNA sample. The police soon returned with a warrant, secured her DNA, and matched it to female DNA found on a swab of D.H.'s genitals. Detective Pasheilich testified that the police then arrested the female accomplice. At that time, she admitted that she had been with D.H. at the time he was shot. She also identified Easter and a male associate of his as the shooters.

{¶32} Easter's convictions for aggravated felony murder and felony murder were predicated upon him having been complicit in D.H.'s kidnapping. Easter argues that the State failed to prove those convictions as well as his conviction for kidnapping because there was no evidence that he removed D.H. from a place where he was found or restrained his liberty. *See* R.C. 2905.01(A). Instead, the evidence showed that D.H. willingly drove himself to the parking lot where he was shot and voluntarily engaged in sexual intercourse with the female accomplice. According to Easter, no kidnapping occurred. Thus, he argues his convictions for aggravated felony murder, felony murder, and kidnapping are based on insufficient evidence.

{¶33} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have concluded that the State proved the elements of kidnapping beyond a reasonable

doubt. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. Kidnapping can occur by means of deception. R.C. 2905.01(A). Thus, the act of luring an individual to a location under false pretenses for the purpose of harming him or her can give rise to a conviction for kidnapping. *See State v. Grate*, 2020-Ohio-5584, ¶ 110. The female accomplice's testimony, if believed, proved that Easter asked her to set up D.H. by initiating contact with him, arranging a meetup, and keeping him occupied until Easter could arrive and hurt him. The fact that D.H. willingly drove himself to the parking lot where he died is irrelevant, as D.H. was unaware of Easter's and the female accomplice's plan to keep him in a location until Easter could harm him. The jury reasonably could have concluded that Easter was complicit in D.H.'s kidnapping, as he solicited the female accomplice's help and set in motion the plan to harm D.H. *See* R.C. 2923.03(A)(1); *Rohr-George*, 2007-Ohio-1264, at ¶ 14 (9th Dist.). Accordingly, we reject his argument that his convictions for aggravated felony murder, felony murder, and kidnapping are based on insufficient evidence.

{¶34} Regarding Easter's conviction for tampering with evidence, he concedes that the female accomplice's testimony, if believed, was sufficient to prove that he helped clean blood from the vehicle involved in the shooting. Because Easter concedes that the State introduced sufficient evidence to support that conviction and the record supports his concession, we need not address it further.

{¶35} Finally, Easter argues that his conviction for having a weapon under disability is based on insufficient evidence. He claims the jury issued inconsistent verdicts because it found him guilty of having a weapon under disability while simultaneously rejecting each of his firearm specifications. Upon review, Easter is mistaken. The jury found him not guilty of having a weapon under disability. He was not convicted on that count. Accordingly, his argument to the contrary

lacks merit. Easter's second assignment of error is overruled to the extent it concerns the sufficiency of the evidence.

## Weight of the Evidence

**{¶36}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Id.*

**{¶37}** Easter's assignment of error includes a limited challenge to the manifest weight of the evidence. Once again referring to his charge of having a weapon under disability, he argues that "inconsistency of the verdicts raises legitimate concerns about the conviction . . . being against the manifest weight of the evidence." As noted, however, there was no inconsistency in the verdicts. Easter was not convicted of having a weapon under disability. Easter has not set forth any other argument about the believability of the evidence against him or the credibility of the witnesses who testified. "We are loath to formulate and address a manifest weight argument on [his] behalf when he has not done so." *State v. Yatson*, 2022-Ohio-2621, ¶ 70 (9th Dist.). Thus, Easter's assignment of error is overruled to the extent it concerns the manifest weight of the evidence.

III.

{¶38} Easter's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

FLAGG LANZINGER, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

ADAM M. VANHO, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.